# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN FUNDINGSLAND, | Case No. 15-cv-01053-BAS-WVG |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | **[ECF No. 47]** |
| OMH HEALTHEDGE HOLDINGS, INC., | |
| Defendant. | |

Defendant OMH Healthedge Holdings, Inc. ("OMH") awarded Plaintiff John Fundingsland stock options as part of his employment compensation. Several years later, another company purchased a controlling interest in OMH. This transaction automatically terminated all of OMH's outstanding stock options awards. And, because Plaintiff had never exercised his options, they were extinguished and became worthless.

As a result, Plaintiff brings this diversity action seeking relief against OMH. He argues OMH breached the parties' contracts by not informing him of the impending transaction. The company now moves for summary judgment on Plaintiff's remaining claims for breach of contract and breach of the implied covenant

of good faith and fair dealing under Delaware law. (Mot. Summ. J., ECF No. 47.) Plaintiff opposes. (Opp'n, ECF No. 67.) The Court heard oral argument on the motion. (ECF No. 69.)

Plaintiff fails to demonstrate a triable issue of fact on his breach of contract claim. Nor does he show compelling issues of fairness justify this Court invoking the implied covenant under Delaware law. Therefore, for the following reasons, the Court **GRANTS** OMH's motion for summary judgment.

## I.    BACKGROUND

### A.    Plaintiff's Stock Options

Plaintiff John Fundingsland is "an executive with expertise in revenue cycle management and outsourcing phone calls and business processing services in the healthcare industry." (Fundingsland Decl. ¶ 2, ECF No. 67-1.) In early 2011, Plaintiff was recruited to serve as the Chief Operating Officer of OMH's subsidiary in Chennai, India. (*Id.* ¶ 3.) Plaintiff assumed this role around April 2011. (Joint Statement of Undisputed Facts ("JSUF") ¶ 1, ECF No. 55-1.) As part of Plaintiff's employment compensation, OMH granted him stock options. (*Id.* ¶ 2.)

OMH is a Delaware corporation. Delaware law allows a corporation to issue stock options. *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 976 (Del. Ch. 2001) (citing Del. Code Ann. tit. 8, § 157). "An option is a right to purchase a stock at a given price." *AT&T Corp. v. Lillis*, 953 A.2d 241, 244 n.1 (Del. 2008). The designated price "is known as the *exercise price*." *Id.* Typically, when a stock option "vests," the option holder has an immediate right to "exercise" the option and convert it into stock by paying the exercise price. The option, therefore, does not automatically become stock at the time of vesting; the holder must usually take an action—the "exercise"—to obtain the promised shares. *See, e.g.*, *Eluv Holdings (BVI) Ltd. v. Dotomi*, LLC, No. CIV.A. 6894-VCP, 2013 WL 1200273, at *10 (Del. Ch. Mar. 26, 2013) (drawing a distinction between the vesting and actual exercise of options);

*Knight v. Caremark Rx, Inc.*, No. CIV.A. 1750-N, 2007 WL 143099, at *3–4 (Del. Ch. Jan. 12, 2007) (interpreting a stock option provision that provided for accelerated vesting upon an employee's departure following a change in control of the entity).

The terms of stock options must be "set forth or incorporated by reference in the instrument or instruments evidencing such . . . options." Del. Code Ann. tit. 8, § 157. For Plaintiff's stock options, the terms are contained in three interrelated instruments: OMH's 2007 Stock Incentive Plan, the Stock Option Award Agreement, and a Notice of Stock Option Award. (JSUF ¶ 2.) The Court will examine each item in turn.

### 1. Stock Plan

To promote the success of OMH, the 2007 Stock Incentive Plan ("Stock Plan") establishes a framework for the company to award stock options to its employees, directors, and consultants. (Stock Plan § 1, Pugh Decl. Ex. 1, ECF No. 47-3 at 4.) A person who receives an award of stock options under the Stock Plan is referred to as a "Grantee." (*Id.* § 2(x).) An "Option" is defined as "an option to purchase Shares pursuant to an Award Agreement granted under the Plan." (*Id.* § 2(cc).) Plaintiff's "Award Agreement" is the second document discussed below, and the Stock Plan defines this item as "the written agreement evidencing the grant of an award executed by the Company and the Grantee, including any amendments thereto." (*Id.* § 2(f).)

Beyond establishing a structure for OMH to award options, the Stock Plan sets forth various ground rules for these awards. For example, the Plan speaks to what happens upon the occurrence of a "Corporate Transaction." A Corporate Transaction includes "a merger or consolidation in which the Company is not the surviving entity" and an "acquisition . . . of securities possessing more than fifty (50%) of the total combined voting power of the Company's outstanding securities . . . ." (Stock Plan § 2(q).) The Plan provides that a Corporate Transaction affects awarded stock options as follows:

(a)    Termination of Award to Extent Not Assumed.

(i)    Corporate Transaction.    Effective upon the consummation of a Corporate Transaction, all outstanding Awards under the Plan shall terminate.  However, all such Awards shall not terminate to the extent they are assumed in connection with the Corporate Transaction.

(*Id.* § 11(a).)  Relatedly, the Stock Plan grants its administrator the authority "to provide for the full or partial automatic vesting and exercisability of one or more outstanding unvested awards under the Plan." (*Id.* § 11(b).)  The plan administrator may do so "in advance of any actual or anticipated Corporate Transaction" or "at the time of the grant of an Award." (*Id.*)

The Stock Plan also discusses the suspension or termination of the company's stock option program.  (Stock Plan § 14.)  It imbues OMH's board of directors with the power to "amend, suspend, or terminate the Plan" at "any time." (*Id.* § 14(a).)  That being said, "any termination of the Plan . . . shall not affect Awards already granted, and such awards shall remain in full force and effect as if the Plan had not been . . . terminated[.]" (*Id.* § 14(b).)

Finally, the Plan provides Grantees like Plaintiff with a limited information right: "The Company shall provide to each Grantee, during the period for which such Grantee has one or more Awards outstanding, copies of financial statements at least annually." (Stock Plan § 19.)

### 2.    Option Agreement

Pursuant to the Stock Plan's framework, Plaintiff entered into a Stock Option Award Agreement ("Option Agreement") with OMH.  (Option Agreement § 1, Pugh Decl. Ex. 2, ECF No. 47-3 at 22.)  This agreement, which is subject to the terms of the Stock Plan, grants Plaintiff the stock options described in an accompanying Notice of Stock Option Award.  (*Id.*)  The Option Agreement provides that these options "shall be exercisable during [their] term in accordance with the Vesting

– 4 –

Schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement." (*Id.* § 2(a).) Further, this agreement states Plaintiff may exercise his options "only by delivery of an Exercise Notice (attached as Exhibit A) which shall state the election to exercise the Option [and] the whole number of Shares in respect of which the Option is being exercised[.]" (*Id.* § 2(b).)

### 3. Notice of Stock Option Award

The Notice of Stock Option Award details the specifics of Plaintiff's stock options. (Notice of Stock Option Award, Pugh Decl. Ex. 3, ECF No. 47-3 at 38.) It provides him the option to purchase 268 shares of OMH's common stock at an exercise price of $2,493.34 per share, for a total cost of up to $668,215.12. (*Id.*) The Notice also provides a vesting schedule for Plaintiff's options: his right to purchase the first third of the 268 shares vests on May 23, 2012; the second third vests on May 23, 2013; and the remainder vests on May 23, 2014. (*Id.*)

Pursuant to the Notice, Plaintiff's options expire on May 23, 2021. (Notice of Stock Option Award.) If Plaintiff separates from the company, however, the Notice states he instead has a three-month period to choose whether to exercise those options that have already vested. (*Id.*) Finally, the Notice states that if there is a "Change of Control of the Company whereby a majority ownership is bought by a single investor, all the stock options will vest immediately."[1] (*Id.*)

In sum, the Stock Plan creates the company's stock option program that Plaintiff participated in, and it provides for the termination of any outstanding awards upon a Corporate Transaction. The Option Agreement grants Plaintiff options under this Plan and binds him to the Plan's terms. Last, the Notice of Stock Option Award

---

[1] To be precise, Plaintiff's Notice of Stock Option Award references a "Change of Control"—not a "Corporate Transaction." The Notice incorporates the Stock Plan's defined terms, and the Plan has a separate definition for a "Change in Control" versus a "Corporate Transaction." (*See* Stock Plan § 2(i), (q).) The Change in Control definition is narrower; it means certain transactions that occur (i) after the company has gone public or (ii) when the company is purchased by a publicly-traded company. (*See id.* § 2(i), (hh).)

– 5 –

provides the specifics of Plaintiff's award, including the number of options, the amount he needs to pay per share to exercise the options, and when his options become exercisable and expire.

### B.  Plaintiff's Separation from OMH

"Plaintiff's employment as C.O.O. with Defendant's company in India ended in about May 2012." (JSUF ¶ 6.)  Thus, under the terms of his stock option award, Plaintiff had only three months from his date of separation to exercise his vested options.[2]  (Notice of Stock Option Award.)  However, when he separated from the company, Plaintiff and OMH entered into a Separation Agreement dated May 28, 2012. (*Id.* ¶ 7.)  The Separation Agreement extended the date for Plaintiff to exercise his options as follows: "All of your stock options granted to you on May 23, 2011, via Award number OMH-028, must be exercised by October 15, 2012.  This clause supersedes the 'Post-Termination Exercise Period' defined in [the Notice]." (Separation Agreement, Pugh Decl. Ex. 4, ECF No. 47-3 at 43.)  Further, the Separation Agreement notes:

> If a change of control occurs prior to you exercising your options, it is anticipated that the buyer will only purchase a portion of the outstanding options from the management team (50% is our expectation but will be up to the buyer), which you are a part of.  Whatever portion the buyer allows the management team to exercise is the same percentage that will be used to determine the number of options you will be able to sell.  None of your remaining options will be extended past the change of control.

(*Id.*)[3]  The Court will refer to this provision as the "Management Team Options Provision."  The Separation Agreement also provides for Plaintiff to continue to work for OMH as a consultant until November 30, 2012.  (*Id.*)

---

[2] On May 23, 2012, the first third of Plaintiff's options vested—giving him the right to purchase up to 88 shares of OMH at a cost of $2,493.34 per share. (Notice of Stock Option Award.)

[3] OMH has not argued that this provision only applies to transactions that meet the narrower definition of a "Change in Control" under the Stock Plan, as compared to those events that satisfy the definition of a "Corporate Transaction."

Plaintiff asked to extend the deadline for him to exercise his options because he knew there was a potential OMH would be sold. (JSUF ¶ 16.) OMH's President Anurag Mehta testified that from 2011 onward, OMH was "constantly in . . . sale mode," and that "it was not any secret." (*Id.* ¶ 14.) Following Plaintiff's departure from OMH, then-board member Dennis Drislane testified that he would give Plaintiff "the general sense that [OMH was] still in the market looking for a buyer," but not "any confidential information as it relates to deals [OMH was] working on." (*Id.* ¶ 12.) Specifically, on September 27, 2012, Plaintiff e-mailed Drislane asking about the status of a pending deal. (Fundingsland Decl. ¶ 10, Ex. 1.) Drislane responded:

> John, it appears that the deal is dead. If that's the case, we will probably pull back and focus on building the company, perhaps even do an acquisition. Gopi wants to wait until after we are sure the deal is dead before discussing your options. I expect that will be another week or two, I will keep you informed.

(*Id.*)

Given that Plaintiff's options were set to expire on October 15, 2012, he followed up on October 4, 2012, to discuss his outstanding options. (Fundingsland Decl. Ex. 1.) After talking with the other members of the board, Drislane responded on October 8, 2012, stating:

> The Board is willing to extend the execution period for 1/3 of the original number of your options (90), since you worked for us for 1 year of the contemplated 3-year employment period. The exercise period for these 90 options will be extended from October 15, 2012, to March 31, 2013. We hope to have a transaction done in the first quarter, so that would allow you to benefit from a transaction that is completed over the next six months. Even if a transaction is not completed during this six month period, it still would allow you to exercise your options next year with the resulting tax implications potentially offset by a transaction that occurs any time in 2013.

(*Id.*)

– 7 –

15cv1053

Accordingly, on October 9, 2012, Plaintiff and OMH amended the Separation Agreement. (JSUF ¶ 8.) Plaintiff's number of stock options was reduced from 268 to 90, and the exercise date for the options was extended until March 31, 2013. (*Id.*)

Finally, in an amendment to the Separation Agreement dated March 29, 2013, the parties further extended the exercise date for Plaintiff's stock options to December 31, 2013. (JSUF ¶ 9.) By this time, Plaintiff was no longer working as a consultant for OMH. (*Id.* ¶¶ 6, 27.) On April 2, 2013, Drislane told Plaintiff via e-mail that "[t]he Board has approved extending your options through the end of the year" and "[h]opefully we will have a transaction done by then!" (*Id.* ¶ 13.)

## C.    Corporate Transaction

Meanwhile, on March 27, 2013, OMH and an entity that ultimately purchased the controlling interest in the company ("August 2013 Purchaser") entered into a Mutual Non-Disclosure Agreement ("NDA") regarding potential business relationship discussions. (JSUF ¶ 17.) The NDA restricted the use of confidential information to employees, attorneys, agents, and other individuals needing to know such information to facilitate the potential business arrangement. (NDA ¶ 3, Pugh Decl. Ex. 8, ECF No. 47-3 at 53.)

On June 13, 2013, OMH and the August 2013 Purchaser entered into an Exclusivity Agreement, which was expressly designated as "Confidential Information" under the NDA. (JSUF ¶ 20.) The Exclusivity Agreement prohibited OMH from initiating, accepting, or soliciting any offers relating to the acquisition of OMH's assets or stock. (Exclusivity Agreement 1–2, Pugh Decl. Ex. 9, ECF No. 47-3 at 57.) The period of the Exclusivity Agreement was subsequently extended on July 31, 2013, and again on August 19, 2013. (Amendment to Exclusivity Agreement 1, Pugh Decl. Ex. 10, ECF No. 47-3 at 62; Amendment No. 2 to Exclusivity Agreement 1, Pugh Decl. Ex. 11, ECF No. 47-3 at 65.)

On August 30, 2013, OMH's Board of Directors terminated the Stock Plan. (JSUF ¶ 23.) On the same day, a Corporate Transaction occurred when the August 2013 Purchaser and OMH entered into a Series B Convertible Preferred Stock Purchase Agreement ("SPA"). (*Id.* ¶ 24.) "Under Section 5.5 of the SPA, all outstanding stock options were automatically terminated pursuant to the terms of the Stock Option Plan." (*Id*. ¶ 25.)

While some of OMH's employees involved in due diligence for the Corporate Transaction were aware of the pending August 2013 Transaction, CEO Natarajan testified that none of OMH's active employees exercised their stock options before the sale of the company. (JSUF ¶ 26.) Nor did OMH publish the "change in the stock option plan . . . to the option holders." (*Id.* ¶ 44.) Further, CEO Natarajan testified that employees who had stock options at the time of the sale did not receive compensation related to the stock options. (*Id.* ¶ 47.)

### D. Closing and Change in Control Bonuses

Although none of OMH's active employees exercised their stock options before the sale, thirteen employees received "Closing and Change in Control Bonuses." (JSUF ¶¶ 48–51.) CEO Natarajan stated these bonuses were "purely stay bonus[es]" based on tenure and seniority in the company. (*Id.* ¶ 48.) Plaintiff, however, has produced a "spreadsheet indicating that 13 of the 14 of [OMH's] employees granted Closing and/or Change in Control Bonuses received bonuses in an amount of 41% [of] the value of their outstanding options . . . and that 1 out of the 14 received a bonus that was 48% of the value of her outstanding options." (*Id.* ¶¶ 49–50.)

"On October 24, 2013, [Plaintiff] reached out to [President] Mehta to inquire about the status of a transaction. During that conversation, Mehta denied any sale or change in control." (Fundingsland Decl. ¶ 13.) "Plaintiff testified that while he had the financial capability and there was nothing preventing him from exercising the

stock options, he nevertheless chose not to exercise his stock options." (JSUF ¶ 29.) Plaintiff later learned of the Corporate Transaction from another person, but when he again spoke with President Mehta, "Mehta told [him] that as a result of this transaction, [his] options had been terminated in August 2013." (Fundingsland Decl. ¶ 15.)

### E. Procedural History

In his First Amended Complaint, Plaintiff brought claims against OMH for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) fraudulent misrepresentation and concealment. (First Am. Compl. ¶¶ 18–40, ECF No. 17.) The Court granted OMH's motion to dismiss Plaintiff's concealment claim, but denied the company's request to dismiss Plaintiff's contract claims.[4] (ECF No. 24.) OMH now moves for summary judgment on Plaintiff's remaining claims.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

---

[4] In its order on OMH's second motion to dismiss, the Court relied upon several allegations in Plaintiff's amended pleading that are undermined by the undisputed evidence. In particular, Plaintiff alleged that "other members of the management team had indeed been able to sell at least fifty percent of their options to the new majority shareholder as outlined in the May 28, 2012 separation agreement"—implicating the plain language of the Management Team Options Provision. (First Am. Compl. ¶ 17; *see also id.* ¶ 24.) However, it is undisputed that all of the company's outstanding options were terminated in the transaction, and none of OMH's active employees exercised their options before the sale of the company. (JSUF ¶¶ 25–26.)

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

15cv1053

# III. ANALYSIS

## A. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[5] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005). "The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "Contracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms." *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 983 (Del. Ch. 2010). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997); *accord GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012); *see also SV Inv. Partners*, 7 A.3d at 983 ("When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract.").

In his First Amended Complaint, Plaintiff alleges OMH breached the Management Teams Option Provision. (First Am. Compl. ¶¶ 22–24.) OMH moves for summary judgment on this claim, arguing it did not breach this express provision. (Mot. Summ. J. 3:10–28.) In response, Plaintiff seeks to survive summary judgment based on not only this contractual obligation, but also a series of additional provisions that he did not identify in his pleading. (Opp'n 10:7–18:9; *see also* Reply 1:8–4:2.)

---

[5] As determined in the Court's order on OMH's motion to dismiss (ECF No. 16), Delaware law applies to Plaintiff's claims because (i) the parties invoked the state's law in an express choice-of law provision, and (ii) Delaware has a substantial relationship to the parties. *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009) ("In determining the enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state, in this case California."); *see also Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 462 (1992) (identifying California's test for enforcing a contractual choice-of-law provision).

The Court will first address the provision raised in Plaintiff's First Amended Complaint; it will then turn to whether considering Plaintiff's additional theories based on other contractual obligations is appropriate.

### 1.    Management Team Options Provision

Plaintiff argues summary judgment is inappropriate because a jury could conclude OMH breached the Management Team Options provision "by denying him a lump sum predicated on the value of his options." (Opp'n 16:25–18:9.) To recall, this provision states, "if a change in control occurs prior to [Plaintiff] exercising [his] options, . . . [w]hatever portion the buyer allows the management team to exercise is the same percentage that will be used to determine the number of options [he] will be able to sell." (Separation Agreement 2.)

Plaintiff fails to demonstrate there is a genuine issue for trial on this claim. The plain language of the Management Team Options Provision promises that Plaintiff "will be able to sell" the same "percentage . . . of options" as the buyer "allows the management team to exercise." It is undisputed, however, that due to the Corporate Transaction, "all outstanding stock options were automatically terminated pursuant to the terms of the Stock Option Plan." (JSUF ¶ 25.) They were terminated because the August 2013 Purchaser did not assume them in the transaction. (*See* Stock Plan § 11(a)(i) (providing that unless outstanding awards are assumed in the Corporate Transaction, "all outstanding Awards under the Plan shall terminate).) None of OMH's "active employees exercised their stock options before the sale of" the company. (*Id.* ¶ 26.) Consequently, as a matter of law, Plaintiff cannot show the management team . . . exercise[d]" a "percentage" of their options, which would have triggered the provision he claims the company breached. In other words, he cannot demonstrate OMH breached the Management Team Options Provision. *See, e.g.*, *SV Inv. Partners*, 7 A.3d at 983 (providing that when the contract is clear, the court "should rely solely on the clear, literal meaning of the words" it contains). And,

given that Plaintiff fails "to make a sufficient showing on an essential element" of his breach of contract claim, summary judgment on this cause of action is warranted. *See Celotex*, 477 U.S. at 323.

Plaintiff nevertheless tries to survive summary judgment by focusing on the Closing and Change in Control Bonuses awarded to thirteen employees. (Opp'n 17:3–18:9.) He argues the evidence—viewed in the light most favorable to him— demonstrates these bonuses were "predicated solely on the value of outstanding options," creating a triable issue of material fact on his breach of contract claim. (*Id.* 18:5–7.)

The Court is unconvinced. Even if the Closing and Change in Control Bonuses were awarded based on the value of outstanding options, this interpretation does not displace the fact that Plaintiff's unexercised options were terminated under the plain language of the Stock Plan. (JSUF ¶ 25.) Nor does this interpretation mean the company's management team members "exercise[d]" a percentage of their options in the sale—triggering the Management Team Options Provision. (*See* Separation Agreement 2.) They did not. (JSUF ¶ 26.) Simply put, Plaintiff still does not demonstrate the plain language of the Management Team Options Provision was breached.

In sum, because Plaintiff has not produced evidence demonstrating OMH breached the Management Team Options Provision, OMH is entitled to judgment as a matter of law on Plaintiff's claim for breach of this obligation.

## 2. Additional Contractual Provisions

Beyond the Management Team Options Provision, Plaintiff seeks to rely on several other portions of the parties' agreements to serve as the "contractual obligation" for a breach of contract claim. *See Spherion*, 884 A.2d at 548. These are:

– 14 –

(1) The Stock Plan's provision authorizing the plan administrator "to amend the terms of any outstanding Award granted under the Plan, provided that any amendment that would adversely affect the Grantee's rights under an outstanding Award shall not be made without the Grantee's written consent." (Stock Plan § 4(c)(vii); *see also* Opp'n 10:20–24.)

(2) The Option Agreement's requirement that "[t]he Notice, the Plan, and this Option Agreement . . . may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee." (Option Agreement § 17; *see also* Opp'n 10:24–28.)

(3) The Stock Plan's requirement that OMH "provide to each Grantee, during the period for which such Grantee has one or more Awards outstanding, copies of financial statements at least annually." (Stock Plan § 19; *see also* Opp'n 15:12–15.)

(4) The Option Agreement's specification that "[n]o Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax . . . including, without limitation, such other tax obligations of the Grantee incident to the receipt of Shares . . . ." (Option Agreement § 2(c); *see also* Opp'n 15:18–25.)

(5) The Notice of Stock Option Award's provision that "[i]n the event of a Change of Control of the Company whereby a majority ownership is bought by a single investor, all the stock options will vest immediately." (Notice of Stock Option; *see also* Opp'n 16:7–24.)

OMH argues the Court should not consider whether Plaintiff demonstrates a triable breach of contract claim based on these provisions because Plaintiff failed to identify them prior to the filing of his Opposition. (Reply 1:8–4:2.)

"Where plaintiffs 'fail[ ] to raise [a claim] properly in their pleadings, . . . [if] they raised it in their motion for summary judgment, they should [be] allowed to incorporate it by amendment under Fed. R. Civ. P. 15(b).'" *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (alterations in original) (quoting *Jackson v. Hayakawa*, 605 F.2d 1121, 1129 (9th Cir. 1979)); *accord Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). And, "when issues are raised in opposition to a motion [for] summary judgment that are outside the scope of the complaint," the district court should construe the new matter as a request to amend the pleadings under Rule 15(b). *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir. 1994) (citing *Jackson*, 605 F.2d at 1129); *but see La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (noting the plaintiff "may not effectively amend its Complaint by raising a new theory of standing in its response to a motion for summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (internal quotation marks omitted).)

Delaware law requires that a plaintiff identify an express contract provision that the defendant breached to state a claim for breach of contract. *E.g.*, *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007) (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)). Plaintiff's initial pleading ran afoul of this requirement—he generally alleged that "Defendant breached the contracts" at issue. (Compl. ¶ 20.) Consequently, the Court granted OMH's motion to dismiss this claim with leave to amend. (ECF No. 16.) Plaintiff responded by amending his pleading to identify the Management Team Options Provision as the basis for his claim, but he did not invoke the other express provisions he now seeks to rely upon. (*See* First Am. Compl. ¶¶ 22, 31.)

Further, OMH demonstrates that Plaintiff did not identify these provisions when prompted to do so in discovery. The company propounded an interrogatory

asking Plaintiff to "identify . . . (i) the specific provision(s) you contend were breached," but Plaintiff's response does not identify any of the additional provisions he now claims were violated.  (Pl's Resp. to Def.'s Interrogs. 14:1–25, Pugh Decl. Ex. 15, ECF No. 47-3 at 85.)

The Court concludes Plaintiff failed to properly raise his alternative breach of contract claims in his First Amended Complaint.  Because he first raises them in his Opposition, the Court construes the new matter as a request to amend the pleadings under Rule 15(b).  *See Apache Survival Coal.*, 21 F.3d at 910.  Rule 15 advises that "leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  "This policy is 'to be applied with extreme liberality.'"  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir. 2001)).  "Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint."  *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).  Of these factors, prejudice to the opposing party carries the greatest weight.  *Aspeon, Inc.*, 316 F.3d at 1052.  However, absent prejudice, a strong showing of the other factors may support denying leave to amend.  *See id.*

On balance, these factors demonstrate granting leave to amend is not appropriate here.  First, granting leave would prejudice OMH.  Discovery is now closed.  The parties have completed their pre-trial disclosures, and only a potential trial in this action remains.  Moreover, there is no indication that the company was on notice of these additional breach of contract claims.  Rather, OMH filed this summary judgment motion targeting the contract provision Plaintiff identified in his First Amended Complaint in response to the company's motion to dismiss.  Plaintiff's pleading and his discovery response did not identify any of the additional provisions.  Hence, this factor indicates the Court should deny leave to amend.  *See Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973) ("[T]he crucial factor

– 17 –

is the resulting prejudice to the opposing party."); *see also Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999); *Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998).

The undue delay factor points to the same outcome. Plaintiff's First Amended Complaint was filed seventeen months before his Opposition to OMH's motion for summary judgment. The delay is also unexplainable. For instance, one of the new provisions Plaintiff argues OMH breached is the requirement that the company provide him with annual financial statements. But whether OMH provided Plaintiff with financial statements during the years prior to this lawsuit was within Plaintiff's knowledge at the time he commenced this action. Therefore, the unwarranted delay in identifying this provision supports denying leave to amend. *See Kaplan*, 49 F.3d at 1370 (reasoning denial of leave was appropriate at the summary judgment stage where the plaintiff was aware of two documents containing alleged false statements "from the beginning of the litigation"); *see also AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) ("We have held that an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable.").

In addition, Plaintiff has previously amended his pleading. This factor, too, supports denying him leave to amend to raise several new breach of contract claims that are predicated on different obligations. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (providing "a district court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint . . . .'" (quoting *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980))).

Accordingly, although the Court construes the new breach of contract claims raised in Plaintiff's Opposition as a request for leave to amend his pleading, the Court denies Plaintiff's request upon consideration of the relevant factors. Overall,

summary judgment is appropriate on Plaintiff's first cause of action because he fails to demonstrate a triable breach of contract claim.

### B.    Breach of the Implied Covenant of Good Faith and Fair Dealing

OMH also moves for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. (Mot. Summ. J. 15:21–22:9.) The company argues it is entitled to summary judgment because Plaintiff cannot demonstrate it acted unreasonably or arbitrarily. (*Id.*) In response, Plaintiff argues OMH breached the implied covenant by, among other things, not notifying him of the impending Corporate Transaction. (Opp'n 19:7–23:28.) Ultimately, after hearing oral argument on this claim, the Court grants OMH's motion because Plaintiff fails to demonstrate the implied covenant applies in these circumstances.

### 1.    Framework Under Delaware Law

Under Delaware law, the implied covenant of good faith and fair dealing exists in every contract. *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017). The implied covenant of good faith "is the obligation to preserve the *spirit* of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 444 (Del. 2005) (quoting *Pierce v. Int'l. Ins. Co. of Ill.*, 671 A.2d 1361, 1366 (Del. 1996)). The doctrine "is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Id.* at 441 (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

"A claim for breach of the implied covenant 'is contractual.'" *NAMA Holdings, LLC v. Related WMC LLC*, No. CV 7934-VCL, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member*, 50 A.3d 434, 439 (Del. Ch. 2012)). Thus, "the elements of an implied covenant claim are those of a breach of contract claim: 'a

specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Id.* (quoting *Fitzgerald v. Cantor*, No. C.A. 16297-NC, 1998 WL 842316, at \*1 (Del. Ch. Nov. 10, 1998)).

Applying the implied covenant "involves a 'cautious enterprise.'" *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap*, 878 A.2d at 441). The doctrine is "rarely invoked successfully," and it is subject to several constraints. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). Initially, "[t]he implied covenant cannot be invoked to override the express terms of the contract." *Id.*; *see also Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."); *accord Nemec*, 991 A.2d at 1125–26.

Further, the doctrine applies only "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. In making this determination, the court "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Id.* (footnote omitted). "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.* "[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

Accordingly, conducting a "quasi-reformation" to imply contract terms "'should be [a] rare and fact-intensive' exercise, governed solely by 'issues of compelling fairness.'" *Dunlap*, 878 A.2d at 442 (alteration in original) (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992

(Del. 1998)). "Only when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter' may a party invoke the covenant's protections." *Id.* (quoting *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

## 2.    The Implied Obligation to Notify Plaintiff of a Transaction

At the threshold, Plaintiff must demonstrate it is appropriate to invoke the implied covenant and imply a specific contractual obligation in these circumstances. At oral argument, the Court pressed Plaintiff's counsel to identify the specific implied obligation that Plaintiff is requesting the Court imply into the parties' agreements. (ECF No. 69.)  Plaintiff's counsel indicated that the implied requirement should be that OMH must notify Plaintiff of an impending transaction that would terminate his options.  (*See id.*)  Stated differently, in Plaintiff's view, the parties' agreements should prohibit OMH from completing a Corporate Transaction—and therefore terminating any outstanding options—without first warning Plaintiff to allow him to decide whether to then exercise his options.  (*See id.*; *see also* Opp'n 21:9–11 ("It was implied that Plaintiff would be informed of an impending change in ownership of Defendant so he could decide when to exercise the stock options[.]").)

Based on the undisputed facts, the Court will not imply this obligation for several reasons.  First, "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider[.]"  *See Nemec*, 991 A.2d at 1126.  Plaintiff fails to demonstrate the conduct he complains of—a transaction being completed without the company providing him notice beforehand—could not have been anticipated at the time the parties' agreements were negotiated.  And "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party

to a contract." *See id.* at 1128. Therefore, Plaintiff does not show the covenant should protect him in these circumstances.

Second, as a matter of law, Plaintiff fails to show it is "clear from the writing[s] that the contracting parties 'would have agreed to proscribe'" the termination of his options in a Corporate Transaction without advance notice "had they thought to negotiate with respect to that matter.'" *See Dunlap*, 878 A.2d at 442 (quoting *Katz*, 508 A.2d at 880). Rather, the parties' contracts point toward the opposite conclusion.

Under the Stock Plan, option holders like Plaintiff accept the risk that a Corporate Transaction will terminate any unexercised options to the detriment of the option holders. They accept this risk because the Stock Plan is missing a provision commonly found in instruments involving securities: an "anti-destruction" provision. *See, e.g.*, *AT&T Corp.*, 953 A.2d at 244. "'Anti-destruction' clauses generally ensure holders of certain securities of the protection of their right of conversion in the event of a merger by giving them the right to convert their securities into whatever securities are to replace the stock of their company." *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1352. As an example, in *AT&T Corp.*, the option plan contained an anti-destruction provision that "preserved the option holders' 'economic position' upon the happening of certain specified events, including a merger." 953 A.2d at 244. Similarly, in *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 700–01 (Del. Ch. 2004), the plaintiffs who owned stock warrants were "protected by a standard 'anti-destruction' provision,'" which allowed them to exercise their warrants after a merger to receive "the shares or other securities or property" the plaintiffs would have received had they exercised their warrants immediately prior to the merger. As the Court of Chancery has explained, anti-destruction provisions are critical for option holders:

//

//

> Before the advent of anti-destruction clauses, options were rendered worthless if the company engaged in a transaction that destroyed the underlying security, even if that underlying security was thereby converted into the right to receive something else of value. It is for this reason that anti-destruction clauses are included in option agreements— to prevent opportunistic behavior by corporations that benefits stockholders at the expense of option holders.

*See Lillis v. AT&T Corp.*, No. CIV.A. 717-N, 2007 WL 2110587, at *12 (Del. Ch. July 20, 2007), *remanded on other grounds*, 953 A.2d 241 (Del. 2008).

Viewing the evidence in the light most favorable to Plaintiff, OMH engaged in "opportunistic behavior" that benefited existing shareholders at the expense of Plaintiff. *See Lillis*, 2007 WL 2110587, at *12. But, unlike the security agreements in the cases mentioned above, the parties' agreements do nothing to prevent the destruction of OMH's outstanding options. Instead, the Stock Plan affirmatively provides for this result—Section 11(a)(i) expressly provides that all outstanding options will be destroyed in a Corporate Transaction unless they are assumed in the transaction. (Stock Plan § 11(a)(i).) In other words, destruction is the default outcome. (*Id.*)

Given this provision, Plaintiff accepted the risk that so long as he chose not to exercise his options, those options might be terminated in a Corporate Transaction. Nothing in the agreements provides him with the right to receive advance notice of this event to allow him to decide whether to then exercise his options. And it would be inconsistent to imply an obligation that would require OMH to provide advance notice to an option holder like Plaintiff to protect him from the consequences of the express termination provision. *See Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006) (noting a plaintiff "cannot use the implied covenant of good faith and fair dealing to avoid the consequences of the plain language of the contract"); *see also Airborne Health*, 984 A.2d at 146 ("[T]he implied obligation must be consistent with the terms of the agreement as a whole."). Consequently, Plaintiff fails to demonstrate it is clear from the parties' agreements

that they would have agreed to require OMH to notify him of an impending transaction. *See Airborne Health*, 984 A.2d at 146 (providing that the court "should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it"); *see also Nemec*, 991 A.2d at 1126 ("Parties have a right to enter into good and bad contracts, the law enforces both.").

At oral argument, Plaintiff argued the Option Agreement nevertheless supports the implied obligation he requests because the agreement requires the company to notify him of any actions that are adverse to his interests. (ECF No. 69.) The Court disagrees. The Option Agreement provides only that "[t]he Notice, the Plan, and this Option Agreement . . . may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee." (Option Agreement § 17.) That is, the Option Agreement provides that the terms of the option instruments may not be changed to Plaintiff's detriment without his consent. This provision does not require that he be generally notified of impending actions that are adverse to his economic interests. Further, OMH did not adversely modify any of the agreements' terms when it terminated Plaintiff's unexercised options—the company was already expressly authorized to take this action under Section 11(a)(i) of the Stock Plan. Hence, the Court rejects Plaintiff's argument that the Option Agreement's modification provision supports an implied obligation to inform Plaintiff of an impending transaction. *See Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.").

In addition, although some of OMH's treatment of Plaintiff may appear "unfair," that is not the Court's inquiry. Plaintiff's implied covenant claim is contractual, and the doctrine he invokes "is not a free-floating duty unattached to the underlying legal documents." *See Gerber*, 67 A.3d at 418. "The Court does not derive implied obligations from its own notions of justice or fairness. Instead, it asks what the parties themselves would have agreed to 'had they considered the issue in

– 24 –

their original bargaining positions at the time of contracting.'" *Miller v. HCP & Co.*, No. CV 2017-0291-SG, 2018 WL 656378, at *9 (Del. Ch. Feb. 1, 2018) (quoting *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013, *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013)). Plaintiff fails to demonstrate OMH's conduct was unfair based on the terms of the parties' agreements. *See Miller*, 2018 WL2018 WL 656378, at *9 ("'[F]air dealing' here does not imply equitable behavior. The term 'fair' is something of a misnomer here; it simply means actions consonant 'with the terms of the parties' agreement and its purpose.'" (footnote omitted).).

In sum, Plaintiff does not show this case presents rare circumstances where issues of compelling fairness justify invoking the implied covenant under Delaware law. *See Dunlap*, 878 A.2d at 442. He fails to present any evidence to show the parties could not have anticipated—at the time of contracting—that a Corporate Transaction would terminate unexercised options without advance notice to the option holders. Nor does Plaintiff present any evidence to demonstrate the parties would have agreed—at the time of contracting—to the implied obligation upon which he now seeks to rely. Consequently, he is not entitled to a quasi-reformation of the parties' agreements under Delaware law, and the Court will grant summary judgment for OMH on Plaintiff's second claim for breach of the implied covenant of good faith and fair dealing.

//
//
//
//
//
//
//
//

15cv1053

## IV. **CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendant OMH's motion for summary judgment (ECF No. 47). Specifically, the Court grants summary judgment in favor of Defendant on Plaintiff's remaining claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The Clerk of the Court is directed to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: July 18, 2018**

Hon. Cynthia Bashant
United States District Judge

15cv1053